## Commonwealth v. Keeler, Appellant.

*Criminal law—Murder—Evidence—Cross-examination—Degree of guilt—Intoxication—Case for jury.*

1. Where on the trial of one accused of murder it appeared from the testimony of a train conductor that on the morning of the killing the defendant, while riding on his train to Clearfield where the crime was committed, remarked as he gave the witness his ticket, "I guess that will take me to Clearfield or to jail," and counsel for the defendant proposed to ask the witness on cross-examination whether the remark testified to by him as having been made by defendant was not a common remark made by passengers on his train, the court made no error in sustaining an objection to this offer, where counsel for defendant did not offer to show that the remark had been made by the defendant in a jocular sense or that it was meaningless drunken babble.

2. In the trial of an indictment for murder it appeared that defendant had been an employee of a brewery belonging to de-

ceased and had been discharged; that he declared on several occasions shortly before the shooting that, "They need a good cleaning up," and "When I start I will be dirty"; that the day before the killing he said to the deceased, "Well, I'm going to have those two hours or there will be hell around here to-morrow"; that about one o'clock on the day of the shooting he purchased a revolver; that shortly thereafter he said he was going over to Clearfield to "Raise hell"; that on the train he remarked to the conductor, as he gave him his ticket, "I guess that will take me to Clearfield or to jail;" that at the brewery he said to a man who accidentally touched him, "Don't touch me, I am a bad man, a damned bad man, I'm going to do something bad before long"; that when the brewmaster ordered the bartender not to serve him any more beer, defendant said, "That will be your last anyway, you will not give anybody any beer any more......just give me about five minutes"; that the deceased came in and endeavored to persuade him to leave the premises, but defendant refused, and when deceased went into the office and requested the bookkeeper to call the police, defendant followed, and after threatening language, shot and killed the deceased and wounded the bookkeeper, and the brewmaster and another employee, after which he walked out of the place and threatened a police officer who attempted to arrest him. Defendant contended that he was in such a state of intoxication from the excessive use of alcoholic liquors that he was unable to form an intent to take life and that, therefore, his crime should not rise higher than murder of the second degree. Defendant testified he had been drinking beer and whiskey in the morning of the day previous to the killing until late that night and that he had been drinking during the day of the crime; that he had no recollection of his trip to Clearfield; that his mind was a blank after entering the brewery where the killing occurred, until he left the place, when he was informed by a boy of the deed which he had committed. Several witnesses for the defense testified that in their opinion he was drunk when on the train. The Commonwealth produced witnesses who testified defendant was not under the influence of liquor at the time when he shot deceased and that he did not appear to be drunk when he left the brewery. *Held,* that a verdict of guilty of murder of the first degree should be affirmed.

Argued Oct. 7, 1913. Appeal, No. 214, Jan. T., 1913, by defendant, from judgment of O. & T. Clearfield Co., Dec. T., 1912, No. 16, on verdict of guilty of murder of the first degree in case of Commonwealth v. John O.

Keeler. Before FELL, C. J., BROWN, MESTREZAT, POT-
TER, ELKIN, STEWART and MOSCHZISKER, JJ. Affirmed.

Indictment for murder. Before SMITH, P. J.

The opinion of the Supreme Court states the facts.

The jury found a verdict of guilty of murder of the
first degree upon which sentence of death was passed.

*Errors assigned* were various rulings of the trial
judge, and various instructions to the jury.

*A. M. Liveright,* with him *W. C. Miller,* for appellant.

*A. H. Woodward,* with him *James H. Kelly,* District
Attorney, *A. L. Cole, Singleton Bell* and *W. A. Hagerty,*
for appellee.

OPINION BY MR. JUSTICE MOSCHZISKER, November 7,
1913:

On Saturday evening, September 14, 1912, the defend-
ant, John O. Keeler, shot and killed Joseph W. Roesner,
at the latter's brewery in Clearfield, Pa. The defendant
had worked at the brewery about two years, but
on September 13, 1912, after some dispute between
Roesner and Keeler as to the latter's compensation
for overtime, the employment was terminated. It ap-
pears that Keeler had been dissatisfied with his treat-
ment at the brewery for some time, and that he de-
clared on several occasions shortly before the shoot-
ing, "they need a good cleaning up" and "when I
start I will be dirty"; that only the day before the kill-
ing he said to Roesner, "well, I am going to have those
two hours or there will be hell around here to-morrow";
that about one o'clock on the day of the shooting he pur-
chased a revolver in DuBois; that shortly thereafter he
asserted that he was going over to Clearfield "to raise
hell," in one instance accompanying the declaration
with an exhibition of the pistol; that on the train from

DuBois to Clearfield he remarked to the conductor as he gave him his ticket, "I guess that will take me to Clearfield or to jail"; that he arrived in Clearfield about half past four in the afternoon and went to the brewery; that while there he was in an ugly mood and said to a man who accidentally touched him, "Don't touch me I am a bad man, a damned bad man, I am going to do something bad before long"; that he drank several glasses of beer, and when the brewmaster ordered the bartender not to serve him any more he said, "that will be your last any way, you will not give anybody any beer any more......just give me about five minutes"; that the deceased came into the bar and endeavored to get Keeler to leave the premises; that Keeler refused to go and boasted that none of them could put him out; that Roesner then went into his office and requested the book-keeper to call the police; that Keeler followed Roesner into the office and pulling the revolver out of his pocket declared, "You sons of bitches I will shoot you; I will shoot Old Joe, and then I will shoot you son of a bitch (meaning the book-keeper)"; that he thereupon shot Roesner in the stomach and the book-keeper in the face; that he turned on Kircher (the brewmaster) who had started into the back office, and said "you don't need to come, I will get you, I told you so," and shot him through the right hand; that he then pursued another employee of the brewery behind the bar and shot him through the arm; after which he walked out of the place with the revolver in his hand, and within an hour of the shooting, when the chief of police of Clearfield approached to arrest him, he exclaimed, "You stay back or I will blow your brains out." He succeeded in eluding his pursuers for several days, but finally, on the suggestion of his wife, he surrendered himself to the sheriff.

On trial, the accused did not dispute the killing but contended that at the time he was in such a state of intoxication from the excessive use of alcoholic liquors

that he was incapable of forming an intent to take life, and, therefore, his crime could not rise higher than murder of the second degree. He took the stand in his own behalf and testified that he began drinking beer and whiskey early Friday morning, September 13th, and continued throughout the day, that in the evening he went to DuBois where he stayed over night and had several drinks, that on Saturday morning (the day of the killing) he got up between 7 and 8 o'clock, and after taking a couple of drinks purchased a half-pint of whiskey, that he continued drinking during the day, and then went over to Clearfield. The witness said his memory was not clear as to what occurred for some time before leaving DuBois, but that he recollected his trip to Clearfield and going to the brewery; he claimed, however, that after entering the establishment and speaking to Kircher his mind was a blank until he left the place and his boy informed him of the deed he had committed. The defendant called several witnesses who testified that they had seen him in DuBois on September 14th, and that in their opinion he was drunk, and two men who rode on the same train with him from DuBois to Clearfield testified that he was intoxicated at that time; but on the whole the testimony relied upon to establish the defense was far from convincing. The Commonwealth produced numerous witnesses who testified that the defendant was not under the influence of liquor at or about the time of the shooting, that he recognized and conversed with them immediately before, and that he did not appear to be drunk when he left the brewery. The jury rendered a verdict of murder of the first degree; the defendant has appealed, and assigns for error the charge of the trial judge and several rulings upon the evidence.

The first assignment complains that the trial judge refused to permit certain cross-examination of the witness who testified that the defendant had remarked that his railroad ticket would take him to "Clearfield or to jail." Counsel for the defendant stated, "We propose

to ask the witness on cross-examination whether the remark testified to by him as having been made by Keeler is not a common remark made by passengers on his train." An objection to this offer was sustained and an exception granted. Counsel did not propose to show that the remark had been made by the defendant in a jocular sense, or, as he now argues, that it was "meaningless drunken babble," and the offer contains no suggestion to that effect. We are not convinced of error in the ruling on the offer as proposed. As to the second assignment it is sufficient to say that the offer was so vague that the court could not tell therefrom whether the contemplated testimony was admissible or not.

The next assignment covers the charge as a whole, and thereunder it is asserted that the trial judge failed to point out clearly the distinction between "the grades of proof required on the part of the Commonwealth to convict of murder of the first degree and the grade or quality of proof required by the defendant to establish the defense of intoxication." We have read the charge and are not convinced of error in this respect; when the general instructions are considered in connection with the affirmance of the defendant's points, the few mistakes which appear were all made against the Commonwealth and favored the defendant.

The six succeeding assignments attack the charge as inadequate in several particulars and complain of certain specific excerpts therefrom. After considering all the matters here called to our attention, we are not convinced of reversible error; when the excerpts are read in connection with their context, and when the charge is taken as a whole, it is clear that the evidence was fairly reviewed and that the jury were sufficiently instructed properly to understand the relevant rules of law. Finally, a thorough review of the testimony satisfies us that the verdict was fully justified.

The assignments are all overruled, the judgment is affirmed, and the record is remitted to the court below for the purpose of execution.